Seiko Shastri, clinical professor at the University of Minnesota Law School's Federal Immigration Litigation Clinic, on behalf of petitioner Mr. Simon Quito-Guachichulca. Pursuant to this court's local rules, it's my great privilege to introduce the two law students who will be arguing today, both of whom meet this court's requirements for student practice. Molly Clark-Athan will be doing the opening, and Amira Ellison will be doing the rebuttal. And if I may, I'd just like to take a brief moment to acknowledge two additional clinical students who are not arguing the case, but have been integral to representing our client, Alex Lloyd and Corinne Johnson. Thank you very much. Thank you, professor. Ms. Ahsan is going first. Please proceed. Good morning. Your honors, and may it please the court. My name is Molly Clark-Athan, on behalf of petitioner Mr. Simon Quito-Guachichulca. I would like to reserve five minutes for rebuttal. You may. This court should grant Mr. Quito's petition for review and reverse and vacate the BIA's decision for two independent reasons. A ruling by this court in Mr. Quito's favor on either issue disposes of this case. First, a conviction under the Minnesota statute does not categorically match the generic definition of rape as Congress understood that term in 1996. And that is for three distinct reasons. The generic definition excludes digital and mechanical penetration, indeed, as the Fifth and Sixth Circuits have already held. It also excludes oral contact without penetration. And it further requires a higher threshold of incapacitation to find a lack of consent. This court need only agree with the Fifth and Sixth Circuits to dispose of this case. Were this court to disagree, it should still rule in Mr. Quito's favor. Because again, as the Sixth Circuit has already separately held, res judicata applies to removal proceedings under the INA. And it therefore barred DHS's second bite at the apple. I will address each argument in turn. Turning to the federal generic definition of rape, the BIA's generic definition in matter of Keeley is wrong for three distinct reasons. First, the generic definition unambiguously excludes digital and mechanical penetration. Similar to Esquivel-Quintana, applying the traditional tools of statutory interpretation resolves this question. We start with the statute. Congress, in 1996, added rape next to and distinct from sexual abuse of a minor in the same provision. Congress, in doing so, demonstrated that they meant something different by using the two terms separately. Whereas a broader term, like sexual abuse, may encompass digital and mechanical penetration, rape does not. Do you think that today that's true, that digital and manual penetration is not rape? Your Honor, the question at issue here is what is the meaning as Congress understood it in 1996? I agree. I agree. I'm just asking whether it's changed since then. Because I actually think it's inconclusive. If you look at a dictionary, it's inconclusive. There's some that say yes, some that say no in the 90s. But when you fast forward to now, almost every dictionary definition, not everyone, but most of them, seem to suggest that rape would include any type of penetration with anything, really. Your Honor, that is true. However, we could not expect Congress in 1996 to predict what the conception of rape would be in 2024. And so to base our analysis on today's understanding of rape would be erroneous here. What we're looking for in trying to distill and looking at these sources and using the tools of statutory interpretation is Congress's understanding in 1996. And actually, I would push back a little bit that the dictionary definitions are not conclusive, because both the Fifth and Sixth Circuits concluded that the consensus of dictionary definitions at the time was that rape, in requiring sexual intercourse, necessarily excluded digital and mechanical penetration. That's also supported. I'm not sure that's right. I mean, just to be honest, I've looked at dictionaries, and I found quite a few that say differently. I mean, that's neither here nor there, but I'm not sure that they necessarily went over every dictionary. The other problem is we don't have an official dictionary. There are states that have an official dictionary, and Congress uses certain dictionaries. But I've never heard that argued. So you didn't find any basis for that, for preferring one dictionary to another? Your Honor, not necessarily. However, what we do have is the very same dictionary that Congress or that the Supreme Court used in their decision in Esquivel-Quintana. That's the Dictionary of Modern Legal Usage from 1995, and that was used in that Supreme Court precedential decision. Have they used it in other cases? I can't resist asking. I know we're going afield. Your Honor, I'm not aware. Haven't done a holistic review of it, but yes. Proceed with your argument. In addition to the dictionary, there are also additional secondary sources that confirm this reading. The Model Penal Code and a 50-state survey confirm that this interpretation, that the generic definition, does not include digital penetration. So holistically, all the sources, including the text of the statute itself by using the distinct term. How many states have adopted the Model Penal Code? We often get the Model Penal Code argument, and very few states have adopted it, particularly as they wrote it. Do you know how many states have taken the Model Penal Code? Your Honor, I'm not aware of how many states in 1996 adopted this definition of rape. However, what we do know is that the Model Penal Code reflects the legal understanding and the core principles at the time, and so is a helpful secondary source. Without legitimacy. The Model Penal Code lacks legitimacy. You agree? Your Honor, not necessarily. Oh, boy. You know, we have legislators, and we have presidents and governors. We do. However, it's still a source that the Supreme Court has relied on in determining the generic definition, and so it's still incredibly helpful to look at to gain the gist of what that understanding was in 1996. Separately and independently, second, the generic definition requires at minimum some penetration, however slight, which is not satisfied by oral sex acts without penetration. Both the Model Penal Code and the 50-State Survey articulate rape as requiring penetration. And in fact, the BIA itself concluded in its unpublished decision cited in our 28J letter that the generic definition of rape does not include oral sex acts because those can be accomplished. Have they cited it? I couldn't check. Has the BIA cited it since they unpublished it? Your Honor, not that I'm aware of. However, it is helpful for ascertaining the logic used by the BIA. And in fact, it affirms the very same logic that we use. Rape requires penetration, and because oral contact does not require penetration and can be satisfied without penetration, it is overbroad when compared to the generic definition of rape. Counsel, I want to ask you, this is sort of the elephant in the room with Chevron deference. The problem here is I think that, frankly, your argument is better on the plaintext. I don't think it's conclusive, but I think it's better. And that's the problem I'm running into is that we're talking about the reasonableness of the definition. And I just have a hard time seeing how it's unreasonable, what the BIA said. That's the thing I'm struggling with. And if you can provide me some assistance on that, I'd appreciate it. Your Honor, yes. Chevron Step 2, which considers reasonableness, a matter of Keeley, still fails. It's unreasonable because it ignores evidence of the ordinary meaning of rape in 1996 and does not go through the statutory tools of interpretation the way that it is required to. But even before we reach Chevron Step 2, at Step 1, we know that we should not defer because there is not ambiguity. Two sister circuits, the Fifth and the Sixth, have already correctly concluded that using all of these tools of interpretation, a holistic look at the statute shows that no deference is needed. Did they mention Chevron or deference in the other two circuits? Your Honor, I don't know that off the top of my head. I think they didn't, but tell me or your colleagues. Yes, Your Honor. Proceed. In addition, matter of Keeley explicitly leaves open whether oral acts without penetration are rape. It leaves that question for another day. But it still brings me back to the definition of ambiguity, which is, are there two reasonable interpretations? This doesn't ask which interpretation is better. It says, are there two reasonable interpretations? And when you talk about rape, certainly at common law, you're absolutely right. There's only one reasonable interpretation. But you fast forward to the 90s, and things are a little different when they pass the statute. And so I just kind of wonder, and maybe you can help me, why the other interpretation is just flat unreasonable. Nobody could reach that interpretation. Your Honor, that's because it is not moored in analysis of the relevant sources at the time. It points to evolving conceptions of rape past 1996 and does not demonstrate that Congress meant rape more broadly, such as in the term sexual abuse. The text of the statute itself, as written, shows that Congress intended to use the term rape specifically. What do you do, though, about the eight? I think there are eight states. Maybe it's seven. Maybe it's six. I don't remember. But it's somewhere between six and eight that define rape much more broadly than you're suggesting. Again, going back to the reasonable interpretation, because some states define that as rape, doesn't that necessarily make it a reasonable interpretation? Your Honor, not necessarily. The reasonableness of the interpretation is not determined by whether states thought it was reasonable. Otherwise, states could pass whatever legislation they wanted, and the courts would be bound to consider that as reasonable. The states that do explain that rape is broader are in the minority. The majority of the states that use the term rape in 1996 explicitly excluded digital penetration. The majority also excluded oral contact with no penetration at all. And in fact, they also excluded this different threshold of consent, which brings us to the third independent reason, which is that the generic definition of rape, at the very minimum, requires a complainant be incapable of consent. The most opposite authority here is the Model Penal Code, which defines what lack of consent means for both rape and the lesser crime of gross sexual imposition. We know that whatever the consent point. Don't lose your thought, but did the BIA address the consent point? Your Honor, in matter of Keeley, the BIA did address the consent point. No, I mean in the opinion we're reviewing, the order we're reviewing. Does it even use the word consent? Tell me if I'm wrong. I think I'm looking at it. Yeah, Your Honor, no, it does not. Didn't mention it at all. No, however. They impliedly cover it. Yeah, go your however. Yes. Yes, Your Honor. They impliedly cover it, partially because they rely so heavily on the matter of Keeley decision, which does explicitly talk about the consent element. And secondly, it was briefed before the BIA and raised by Mr. Kitto. We know that whatever the consent element is for rape, it is certainly a higher threshold than that for the lesser crime of gross sexual imposition. And critically, matter of Keeley, relies on the model penal code definition for gross sexual imposition, not rape, and setting the bar for consent. But under either definition, Mr. Kitto still wins. Minnesota case law shows that individuals are convicted under the statute, even when a complainant is able to appraise the nature of the sexual act that they're committing. In State v. Ash, despite testimony that the complainant had, and I quote, an understanding of the consequences of sexual intercourse, what rape is, and her ability to say no to sexual intercourse, end quote, the court still held that the complainant lacked the judgment to give reasoned consent. So under either definition, the Minnesota statute is overbroad. You're into the rebuttal time. You realize that. It's a cumulative clock. Oh, yes. Yes, Your Honor. In light of that, I would like to cede my remaining time for rebuttal. Thank you. Mr. Robbins. May it please the Court. I'm Jonathan Robbins, and I'm here on behalf of Merrick Garland, the United States Attorney General. A good morning to everyone. As you've discussed with my colleagues in the opening presentation, there are two primary questions before the Court. The first issue deals with why race judicata isn't applicable to these current proceedings. And the second issue involves whether the board properly found that petitioner's Minnesota state conviction was an aggravated felony. Rape conviction for federal immigration purposes. Just beginning with the race judicata issue. That wasn't argued by opposing counsel. If you want to open it up, you may. Go ahead. It was in the briefing. If the Court is satisfied that race judicata doesn't apply, I'm happy to move on. It's your argument, but I just wanted you to know the peril. Go ahead. OK. Well, look, it sounds like you want to talk a little bit about the second issue, so I can start there. The board here properly found that the petitioner's was an aggravated felony rape for federal purposes. We've now seen the Supreme Court assessing generic federal definitions of all sorts of various crimes in a lot of cases now. There's a large body of law. And the Supreme Court, in assessing generic federal definitions, takes into account a number of different common considerations. It considers whether the interpretation is going to achieve uniformity and applicability throughout the United States. It considers whether the interpretation is consistent with the intent and purpose of Congress and the statute. And really, a particular pertinence to this case, and something that the petitioners didn't mention, it talks about whether the interpretation would effectively make the statute inoperable, whether it would be a practical nullification of the statute. And the petitioners haven't really discussed this, but their interpretation of the statute  statute, inoperative in a vast majority of jurisdictions in the United States. It wouldn't apply to intercourse? Well, when we're talking about the generic definition of rape, we're looking at two things. It's intercourse without consent. So we're looking, using all the tools of statutory construction that the Supreme Court has instructed us to use, we're looking at how the states, or how Congress, intended for what they thought intercourse constituted and what they thought the consent portion constituted. But it's important to understand that the Supreme Court has statute that render the statute inoperable. But I'm just not sure that's right, because when you talk about intercourse, a lot of states actually do it by degree. And so there's separate crimes. And some of them will include intercourse in one degree, and then they'll include, which is carnal knowledge of the common law. And then they'll include these other forms that we're talking about here in different degrees. That's true. And that's why the board, in this case, did exactly what the Supreme Court said we're supposed to do. And it looked at a multi-jurisdictional state survey as to how the states were treating intercourse. And it determined that a majority of the jurisdictions included digital and mechanical penetration. Now, the Supreme Court has, I think, Esquivel-Quintana is probably the most on point in terms of the way it assesses how to determine what Congress thought in 1996. But it's not, the Supreme Court doesn't always just look at what Congress thought in 1996 or at the time of enactment. It's certainly where it starts. But it also does consider the contemporary meaning of the term. It's done that in Esquivel-Quintana. It's done that in Boisin. It did that in Duenas-Alvarez. It did that in Taylor. So the board's interpretation here does what the Supreme Court says it's supposed to do. How can the generic definition change? So things are included in, say, 19, or things are not included in 1996, but they would be included in 2000. So you're literally arguing that the statute has to, the generic definition changes over time. What I'm saying is that the Supreme Court has considered the contemporary meaning in assessing generic definitions in prior cases. I certainly agree that it starts with what Congress was doing in 1996. But one of the things that Congress has also repeatedly refused to do is interpret a statute in a way that renders it inoperable. And in these cases, Esquivel-Quintana, Boisin, Taylor, if you look at what the Supreme Court was talking about in those cases, it did consider also contemporary meanings of the statute beyond simply what Congress was enacting. I'm not saying you don't start with what Congress was doing. You certainly do that. That's absolutely true. But the Supreme Court has also discussed these other considerations. Counsel, it seems to me that the key here is identifying what these relevant sources are when we look to the contemporary meaning. I think the appellant is saying you only look to statutes that use the word rape, and the government is saying we can look beyond that to statutes which use other words for perhaps the same crime. Well, we know the Petitioner is wrong on that point for several reasons. The Supreme Court started in Taylor by saying we don't look at the specific labels that the State gives. And they just, several months ago, this exact point was made in the Pugin case, which we filed a 28-J letter on. That was a case where the Supreme Court was looking at obstruction of justice statutes. And if you actually look at the transcript of oral argument in that case, the Petitioner in that case was making this exact argument. They were saying we should only look at states that are called obstruction of justice. We shouldn't consider these other ones called witness tampering and other cases of the like. The Supreme Court expressly rejected that argument and said it's not the labels that matter. What matters is we're looking for common characteristics of these offenses. They said it in Taylor. They reaffirmed it in Pugin. And this notion that we don't strictly adhere to what the State labels the crime is something that the Supreme Court has repeatedly said. And that really is, I know that the government is asking this Court to deviate from the Fifth and Sixth Circuit. And that's not something the Court should do lightly. When a sister circuit comes to a conclusion, that's an important consideration to take into account. But we know those circuits got that part right. Certainly, the Fifth Circuit got that wrong because it only looked at the 24 states that labeled it rape. And it ignored the majority of states, which I don't think any reasonable person would suggest that those states aren't punishing rape conduct. Right. But because those states didn't call it rape, they didn't even consider what those states were doing. Counsel, as you know, I call it the ERISA issue. They had relating to in the statute in the Supreme Court case you're referring to. That's true. We know from ERISA how broad that can be. So does that completely distinguish your case you're relying on? It does not. Because if you look carefully at the Supreme Court's analysis in that, they first determined that under the statutory interior, the relating to portion of that was only the cherry on top of the analysis that they'd already performed. It didn't rely solely on the relating to language. The Court still went through what the Board properly did here, which is looking at the definitions, the state multijurisdictional survey, the different definitions. So I agree with you that that case was a little bit stronger because it had the relating to language. But if you look carefully at what the Supreme Court did, the relating to was only the cherry on top of the analysis that it had already conducted with respect to determining the generic definition. Counsel, can I ask you about the unpublished BIA opinion we received? One thing that bothers me on this is we have a published opinion, the Keeley opinion, where you're asking us to do Chevron deference. But then that unpublished case, which postdates Keeley, says actually it doesn't include oral sex. And so I don't know that the BIA has figured out what the generic definition is. How do I deal with that? I know it's not precedential. But how do I deal with the fact that we're coming up with inconsistent results from the agency? Well, I agree with you that the Board, certainly in unpublished decisions, has been kind of all over the map on this. And I think it's because it's a bit of a struggle. Because the states call rape all different things, it's a struggle to figure out what the generic definition is. But I think if you look at that unpublished decision by the Board, the Board's decision is pretty obviously has some serious problems. So it says that historically penetration has been important in defining rape. But historically isn't what's important. What we're looking at is what Congress did in 1996. So its reliance on the historical importance of penetration really isn't relevant. They also said that, they said, in our view, the generic definition of rape is not so broad as to necessarily include acts of oral copulation without penetration. But what the Board thinks about it isn't relevant. What's relevant is what Congress thinks about it. And then the Board cites to the different jurisdictions of where they had, where they punished oral intercourse without penetration. But that survey supports the notion that it would be included in the definition of rape. Because what matters is if we're using the states and what they punish as a way of informing what Congress thought the generic definition of rape was, the more states that punish under their rape statutes oral copulation without penetration, that suggests that Congress would have thought that rape would include that type of conduct in the rape-type conduct. So this Board decision, it's unpublished and not binding. You know, it's the published decisions of the Board that the Court should really be looking at for the considered judgment of the Board. I don't disagree, but you realize the conundrum here, which is we would be deferring to an agency interpretation that the agency itself is not consistently following, which I think presents a problem. I mean, I agree with you that the Board in unpublished decisions has been inconsistent. That sometimes happens. Remember, the Board is made up of all different members. There may be differing views. Until they publish something, it's not really the official position of the Board. And again, what really controls here is what the Supreme Court has said, right? That's what the Court should be doing. It doesn't really matter what the Board says if the Supreme Court says that we have to interpret the generic definition in a particular way. And the Board's decision in the published decision does just that. They look at the state survey. They look at the dictionary definitions. They look at the intent and purpose of Congress. That's what the Supreme Court has said we're supposed to do. That's what the Board did in the published decision. Now, you know, the Court here is sort of faced with two different interpretations. You have the Board's interpretation and you have sort of the Board, the petitioner's interpretation, which isn't really, they're not really offering an interpretation. They're just sort of poking holes in the Board's interpretation. They're not really offering you their own generic definition of what rape should be. I think that the implication, maybe they don't come out and say it, but I think the implication is it's sexual intercourse in the traditional way. Not orally, not manually, not digitally, but just plain old sex. That's true, but they're relying on the Black's Law Dictionary version from the time in order to support that notion. The problem with that is that if you examine the Black's Law Dictionary, that also isn't a gender neutral statute, right? That's a statute where a man had to perform this on a woman, not his wife. And I don't think they're arguing that that definition is supposed to be part of the generic definition. I don't think they would dare make that argument. And interestingly enough, the government once tried to make that same argument where we relied on part of a definition while ignoring the parts of the definition that hurt our case. And the Supreme Court obviously rejected the government's attempt to do that. So to the extent they're relying on the Black's Law Dictionary, the Black's Law Dictionary version that they're relying on is basically repeating the common law, right? It's basically incorporating the common law definition of rape. And there's no way that that's the generic definition of rape because it's not gender neutral. I mean, we now know that you can rape somebody who's, you know, a man can rape another man. You know, it's obviously, that's obviously not the correct definition. So they're only relying on that definition for the penetration portion, but they're ignoring it for the portion that would dramatically undercut their case. Counsel, what about the fact, I don't see that consent is considered at all. Is it impliedly or some way considered in the BIA's opinion? It is, Your Honor. And how does that affect the deferential that we should get, deference we should get? I agree with the Petitioner that it's done through implication because the Board is relying on matter of Keeley in that decision. And so Keeley, it goes into the consent issue in great detail. So all the Board was saying in this case is, look, we understand that it's been rejected in the sixth and the fifth, but we're in the eighth and we're relying on our binding precedent. We're bound by matter of Keeley. So the fact that it doesn't mention the word consent, I think it's pretty clearly done through implication because the Board so heavily relies on that. So I agree with the Petitioner on that point. Now, again, the fundamental problem which the Petitioner did not address in the opening presentation is that their interpretation, whatever it might be, renders this rape statute of this aggravated felony rape provision inoperative in the majority of the United States. Time and again, when the Supreme Court has been faced with that precise situation, it has declined to interpret the statute. And Your Honor, you mentioned, you said you thought that the Petitioner had a better plain language argument. That may be true, but the Supreme Court, when looking at plain language, has never interpreted plain language in a way that means that Congress is legislating in some haphazard manner. The Petitioners are trying to narrow the generic definition of rape so narrowly that almost no state can meet it. How could that have possibly been Congress's purpose when we know that Congress was specifically trying to punish non-citizens who commit some of the most heinous crimes in the United States? The Petitioner's interpretation would render the aggravated felony rape statute provision inoperable in the majority of states. In 1996, it wouldn't have been in, I think, 34 states. Probably even more if you take into account their other definitions. I think it's even more than that. I think it's more than 80% now, maybe even more than that. Counsel, do we know if there's evidence of that becoming effectively inoperable in the jurisdictions that agree with the appellant? You mean evidence of it? Well, it's evidence that you can simply be discerned by looking at the different state survey of either the rape statutes or the rape analog statutes. So we know that most of these states would be overbroad if we defined the generic definition of rape in a way that's consistent with the way that Petitioners are arguing the penetration aspect and the consent aspect. So this is something that the Supreme Court regularly considers and regularly rejects. Would Congress have known this? I'm actually thinking it's a matter of history. 95 was shortly after the categorical approach even came into being. MACUS was until 20 years later. So I'm wondering whether they were even legislating against the background of the categorical approach. You might be right about the practical implications, but it doesn't, it's not clear to me that there's an intent problem here. I see I'm out of time. May I answer to the? As long as Judge Strauss can proceed. I agree. There's no way that Congress could have predicted what was gonna happen with the categorical approach and the way various statutes would be rendered overbroad. That being said, Congress did, one of the considerations that the board took into consideration in matter of Keeley was Congress had other statutes at the time compared to federal statutes. And it did look to those statutes as well to determine the generic definition. The one that I think is most pertinent is the Violent Crime Control and Law Enforcement Act where Congress basically didn't use the term rape and used the term aggravated sexual abuse and sexual abuse. And there's a definitional section in there that includes mechanical and digital penetration and also includes oral copulation without penetration. So if you're looking at the comparative federal statutes, it's true that they may not have considered the categorical approach, so comparing states to federal. But if you look at the comparative federal statutes, they also seem to comport with a generic definition of rape that makes more sense. So I see that I'm out of time unless the Court has any further questions. I see no further questions. Thank you for your argument. Thank you very much for your time, Your Honors. My pleasure. Ms. Ellison. May it please the Court, Amira Ellison presenting rebuttal on behalf of Mr. Simone Kito. Your Honors, I would like to make three points in reaction to the government. First, we know from Supreme Court precedent that it is important to exhaust all tools of statutory construction in order to find ambiguity. Those tools of statutory interpretation were laid out in Esquivel-Quintana, and those are the tools that we use in order to interpret the federal statute as a federal generic definition. Here, as the Sixth and Fifth Circuit have already concluded, there's no ambiguity as to what the term rape meant, especially at the time of enactment in 1996. So here there's no Chevron deference, and in fact, the Sixth Circuit overturned matter of Keeley on direct review. The Fifth Circuit didn't consider deference because it predated Keeley, but we do know for a fact that that matter of Keeley was overturned on direct review, and the Sixth Circuit did not defer to matter of Keeley's interpretation. Second, our definition of the federal generic definition of rape does not lead to the absurd result that the government is claiming. In fact, Congress specifically chose rape rather than something broader, rather than cross-referencing, as it did in other statutes, such as the VCCLE, and such as Pugin actually noted. We know that Congress knows how to choose these terms, as my co-counsel pointed out. And so because rape and sexual abuse are necessarily different terms, we know that Congress knows how to choose terms, and we know that they chose the specific term of rape specifically to capture a narrower swath of conduct than sexual abuse. So it doesn't necessarily render other removal grounds inoperable, as the government claims, because it's conceivable that there are sexual abuse statutes in states that are divisible. There are other removal grounds that wouldn't necessarily lead to non-citizens being rendered non-removable, as the government is suggesting. Thirdly, as to the entire definition of the federal generic definition of rape, as we know from Escobar-Quintana, it is not necessary for this court to define the entire contours of the term. All that is before this court is whether the federal generic definition excludes digital and mechanical penetration, which it does, whether it excludes oral contact without penetration, which it does, and whether it requires a higher threshold of incapacitation to find a lack of consent, which it does. And for these reasons, the Minnesota statute is overbroad, and the federal generic definition of rape is unambiguous on these grounds. I just have one more question, if I could. Would this, one thing that I know that we get, I don't want to get in the Rice-Chutakata argument, but would this qualify in your view as moral turpitude? That was not charged. Maybe it should have been charged. And I'm just curious if you have a viewpoint on that. These types of statutes, or the type of statute that Mr. Quito was convicted under, are the types of statutes that are generally deemed crimes involving moral turpitude. So exactly, you're exactly right, Your Honor. For these reasons, Mr. Quito requests this court grant his petition for review, reverse and vacate his order of removal. Thank you. Thank you very much.